**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |  |
|---|---|---|
| KING LOMBARDI ACQUISITIONS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.   0:25-cv-62204 |
| v. | ) | |
| | ) | |
| ADAM PETRICOFF d/b/a Providence | ) | |
| Advisory Partners, LLC | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND SUPPORTING MEMORANDUM OF LAW</u>**

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, plaintiff King Lombardi Acquisitions, Inc. ("Franchisor") respectfully moves this Court for entry of a preliminary injunction order enjoining defendant Adam Petricoff ("Petricoff") from his ongoing breaches of the contractual obligations and restrictive covenants in his Franchise Agreement following the expiration of his franchise term. This motion is supported by the following Memorandum of Law and the facts set forth in Franchisor's Verified Complaint and exhibits thereto.

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

### I.      INTRODUCTION

Defendant Adam Petricoff ("Petricoff") formerly operated a VR® Business Sales/Mergers & Acquisitions franchise in Charlotte, North Carolina (and other locations) pursuant to a Franchise Agreement with Plaintiff King Lombardi Acquisitions, Inc. ("Franchisor"). Both before and after his franchise term expired, and in blatant breach of his contractual obligations and covenants, Petricoff has secretly worked to plan for, establish and operate a directly competing spin-off business (or businesses) in the same market, using confidential and proprietary information and assets he misappropriated from Franchisor. Although Petricoff concealed his unlawful activities for an extended period, Franchisor has uncovered clear evidence that, in accordance with a carefully designed master plan, Petricoff is actively working to steal Franchisor's business.

Petricoff's unlawful conduct has caused and will continue to cause irreparable harm to Franchisor unless enjoined. As detailed in the accompanying Verified Complaint and exhibits thereto, Petricoff is actively misusing using proprietary assets and confidential information stolen from VR® to develop, market and operate competitive businesses, solicit and poach VR®'s customers, cannibalize its goodwill, and interfere with Franchisor's business and franchise system. Under governing Florida law, Franchisor is entitled to a preliminary injunction to enforce its rights, require Petricoff to comply with all of his contractual commitments, and prevent further irreparable harm.

### II.     BACKGROUND

#### A.      The VR® Franchise System

Franchisor grants the right to open and operate business brokerage and intermediary franchises under the name VR Business Brokers®, VR Business Sales/Mergers & Acquisitions®,

1

or simply VR®. (Verified Compl. ("¶ __") ¶ 5.) VR® franchisees operate pursuant to written franchise agreements with Franchisor, and offer a range of services that help clients sell or acquire businesses and business assets, including, among others, brokerage, advisory, intermediation, exit planning, real estate, and valuation services. (¶¶ 5, 7.) Since 1979, Franchisor has invested substantial time, money, and effort to develop and maintain (i) a unique, distinctive, and comprehensive system for establishing and operating VR franchises and (ii) goodwill in its names, brand and marks so that buyers and sellers of businesses recognize the services offered by VR®. (¶ 6.) Franchisor has authorized VR® franchises in locations across the United States. (*Id.*)

Petricoff was formerly VR®'s franchisee in Charlotte, North Carolina pursuant to a Franchise Agreement dated June 24, 2015. (¶ 8 & Ex. 1.) The Franchise Agreement required Petricoff to operate his business in strict conformity with Franchisor's system, methods, branding and requirements, and granted him various rights and benefits during the term, including the right to use and benefit from Franchisor's proprietary assets and goodwill. (¶ 11.) Defined as "Confidential Information" and "IP" in the Franchise Agreement, these assets include, without limitation, VR®'s proprietary business methods and techniques; forms, templates and marketing programs and materials; its customized tools (including databases) and websites; any "ideas, concepts, methods, techniques, or improvements [] relating to [his] Office or the System" developed by Petricoff during the term; "any data collected via e-commerce related to the VR System or the Marks, including any customer data, click-stream data, cookies, user data, hits and the like;" and VR®'s customer lists and goodwill, which are among Franchisor's most valuable assets. (¶¶ 12-13.) When he signed the Franchise Agreement, Petricoff agreed that he would protect and maintain the confidentiality of the VR® information and assets he received (which he acknowledged belonged to Franchisor), would return them at the end of his franchise term, and would never use VR®'s information or assets to compete against Franchisor or its authorized franchisees. (¶ 14.)

In Article 13.1(a), Petricoff acknowledged that Franchisor "would be unable to protect the Confidential Information against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among the franchisees within the VR System" if franchisees were permitted to hold interests in competitive businesses. (¶ 15.) As such, he expressly covenanted that during the term and "for a period of 24 months commencing on the effective date of … expiration" he would not directly or indirectly (1) solicit any Business

Associate, or "compete against [Franchisor] or any VR® Office"; (2) own or operate a competitive business within [North Carolina]; (b) at the Site; (c) within 40 miles of the Site; (d) within the former Territory; or (e) within 40 miles of any other VR® Office then in operation"; or (3) "[i]nterfere with, disturb, disrupt, decrease or otherwise jeopardize [Franchisor's] business or the business of any of [Franchisor's] franchisees." (¶¶ 16-17.)[1] Petricoff acknowledged and agreed that these restrictions were "fair and reasonable," and would "not cause any undue hardship, financial or otherwise." (¶ 18.) Petricoff also acknowledged that the "special knowledge" he acquired as a VR® franchisee would cause "serious injury and loss" if used to compete against VR® before or after the end of his term. (*Id.*)

Thus, Petricoff agreed that upon the expiration of his franchise, he would, among other things, (i) cease all VR® operations and any use of Franchisor's IP, Confidential Information, Marks, systems, URLs and Internet addresses, (Arts. 12.2, 7.4); (ii) pay all outstanding amounts to Franchisor (Art. 12.3); (iii) transfer control of and assign all of the VR® Charlotte Office's listing and related agreements to Franchisor (Art. 12.5); (iv) transfer control over all telephone numbers, directory listings, domain names, email addresses and web pages and websites used for VR® business (Arts. 12.6, 7.5); (v) comply with the non-compete and other obligations set forth in Article 13.1 (Art. 12.9); (vii) return all tangible IP to Franchisor (Art. 12.10); and (viii) immediately cease use of all Confidential Information he obtained during the term (Art. 12.12). (¶ 19.) Petricoff also agreed that the directory listings he used to advertise the VR® office's services would "automatically revert" to Franchisor at the end of his term (Art. 7.2). (¶ 19.)

The Franchise Agreement provides that "upon [Petricoff's] breach or threatened breach" of any of his obligations upon the termination, transfer or expiration of his Agreement, Franchisor is "entitled to seek an injunction restraining the breach and/or to a decree of specific performance, without showing or proving any actual damage, together with recovery of reasonable attorneys' fees and costs incurred in obtaining equitable relief." (¶ 20.)

## C.   Petricoff Operates A Successful Business Under The VR® System

When Petricoff signed the Franchise Agreement, VR® already had an established presence in the Territory for 20 years. (¶ 21.) A prior franchisee had built a successful brokerage business

---

[1] The Franchise Agreement provides that the covenants in Article 13 "are independent of any other provisions of this Agreement." (¶ 17.)

under the VR® brand, and Petricoff benefitted from VR®'s existing goodwill, brand loyalty, and customer base in the Territory, which was among its most profitable markets well before Petricoff acquired his franchise. (*Id.*)

When he joined VR®, Petricoff had no prior training or experience providing business brokerage or related services or owning any business. (¶ 22.) Thereafter, however, he attended VR® franchisee initial training, where he acquired specialized knowledge of Franchisor's proprietary techniques, business operations, and marketing strategies. (¶ 23.) He also received initial and ongoing operational support from VR®'s trainers and a network of VR® mentors, including assistance with site selection, Office setup, and associate recruitment. (*Id.*) He gained access to proprietary VR® manuals, policies, procedures, and tools, including customer lists and databases, listing agreements, marketing and advertising materials, and guidance on implementing effective local marketing strategies. (*Id.*) Ultimately, as a result of his franchise relationship with VR® and the benefits he received, Petricoff learned to operate and market his business, and developed a variety of customized tools, marketing materials, and assets that enabled him to compete successfully as VR®'s representative in the Charlotte market. (¶¶ 22-26.) Notably, he advertised the VR® Charlotte Office as having offices, and serving customers, in locations throughout North and South Carolina, including Columbia, South Carolina. (¶ 27.)

Over the ten-year term, as a result of his own efforts and access to Franchisor's goodwill, proprietary training, system, methods, marketing materials, operating procedures and the other rights and benefits he obtained as an authorized VR® franchisee, Petricoff operated a highly profitable franchise and maintained and developed VR®'s customer base in the Territory. (¶ 28.) In 2024, the VR® Charlotte Office was the most profitable in VR®'s system. (¶ *Id.*)

**D.    Petricoff's Breaches The Franchise Agreement**

**1.    Petricoff Plans to Spin Off His VR® Franchise**

As the end of his franchise approached, Petricoff failed to meet his March 2025 contractual deadline to notify Franchisor of his intent to renew for another term. (¶ 31.) He eventually advised in May 2025 that he would not renew his franchise, but informed Franchisor that he planned to continue to work in the industry (representing that he would comply with all his obligations under the Franchise Agreement). (¶¶ 32-33.) Petricoff did not disclose the details of his plans at this time and immediately left the country for an extended vacation, claiming that he would be unavailable to discuss the transition of his franchise. (¶ 34.) Upon his return, rather than cooperate with the

transition, Petricoff only wanted to discuss a potential buy-out of his non-compete obligations. (¶ 36.) Franchisor, however, told him that it would not agree to any such discussions until Petricoff had complied with his contractual obligations, including his obligations to return and transfer control of VR®'s proprietary assets and IP. (*Id.*) Franchisor was crystal clear that it would not agree to any buy-out in which Petricoff proposed to compete against it using VR®'s own proprietary assets, customers and goodwill. (*Id.*)

As Franchisor only recently discovered, Petricoff had already begun to lay the groundwork to launch his competing business nearly a year earlier. (¶¶ 40-43.) In internal memos from early 2025 (drafted on VR® letterhead), Petricoff detailed the steps he had already taken, as well as his plans, to retain and misappropriate VR®'s confidential information and proprietary assets in order to "rebrand" and spin off his VR® Office as an independent business. (¶¶ 41-44.) Among other things, Petricoff acknowledges that he had been working with the VR® Charlotte Office's existing marketing agency over 2024 to "get ready for a possible transition from my franchise system," had already "developed a strategy with my franchise attorney to seek an exit by the end of June," and had "been working on brand standards guide based on much of our foundational work in the 2nd half of 2024" in order to "enable [the VR® Charlotte Office] to update/pivot to a new brand with minimal downtime." (¶ 41.) According to Petricoff, his "plan for independence" included updating various VR® marketing and client materials, converting his VR® customer relationship management ("CRM") database, and "adding" a separate "seller database" (i.e., which would contain VR®'s most valuable customers and business leads). (¶ 42.)

By February 2024, Petricoff had solicited proposals for a new marketing agency to lead his "[r]ebrand of [the] Company" as an independent business, including to: "[l]ead efforts on naming, logo, etc.;" establish[]a brand standards guide for new brand; "[o]versee new website development;" [d]evelop a plan to roll out new brand with advisors, clients, etc.;" and "[u]pdate up a lot of foundational documentation used by our team (Sales Tool Kit – proposals, PowerPoints, information used in sales presentations, etc.)." (¶¶ 43-44.) In this proposal, Petricoff acknowledged that, during the term, he had been "holding back" various marketing ideas until he became "independent," in contravention of his obligation to use his "best efforts" to promote his VR® franchise during the term. (¶ 43.) By March 17, 2025, his VR® operating entity had signed a new marketing agreement the Wit Group Agency to carry out his competitive plans and activities. (¶ 45.)

By no later than March 2025, Petricoff had developed and begun implementing a secret plan to transition the business and assets of the VR® Charlotte Office to a new independent entity that he planned to use to compete directly against VR® in Charlotte and beyond. (¶ 46.) Petricoff's written transition plan, which Franchisor discovered among various files Petricoff attempted to delete at the end of his term, included the following action items for himself and his team: "[s]toring/keeping past emails," "update logo/name on all documents on shared drive," "[]adding storage" to retain "[a]ll marketing documents," "[u]pdate anything that touches a client/prospect," send "[l]etter to current clients and vendors on name change," "[r]eview current VR documents that need to be transitioned to a non-VR document," including "Engagement agreements, NDAs, CBRS, and Teasers;" "[u]pdate document templates with new logo/name"; and "[u]pdate listings with new logo/name." (*Id.*) As his plan makes clear, Petricoff's intent all along was to misappropriate VR®'s confidential and proprietary information and assets, including VR® customers, prospects, and listings for his own personal benefit, and use them to compete directly against VR® in the Charlotte market. (*Id.*)

Petricoff followed through on the items on his transition plan. (¶¶ 47-54.) Subsequent versions of his plan show progress and include additional action items, including "[n]ew entity set-up," "WIT website," update "CRM in general" and "email signature in CRM," update "all passwords that use VR® email," and update various listing, directory and vendor services used by the VR® Charlotte Office. In a separate tab, his plan includes a list of various vendors, applications and tools used by (and customized for) the VR® Charlotte Office, with log in and password information that Petricoff planned to update so he could retain and transition these VR® assets for use in his independent business. (¶ 48.)

During the term, Petricoff also solicited his VR® associates and Transaction Manager to join his independent, competitive business. (¶ 47.) Like Petricoff, his team had been trained in VR®'s proprietary System, methods and techniques; conducted business using VR®'s confidential and proprietary information, assets, and tools; and benefitted from the substantial goodwill and brand loyalty VR® had developed in the Territory. (*Id.*) By soliciting them to join his competing venture in breach of his obligations under Article 13.1(a)(i), Petricoff could continue to offer the exact same services, using the same specialized knowledge and tools, as the VR® Charlotte office, albeit as an independent business. (*Id.*)

6

Rather than protect Franchisor's confidential information, during the franchise term Petricoff contacted VR®'s competitors with a list of the confidential and proprietary assets he had retained and sought their advice on whether he was missing anything he would need to operate independently. (¶ 50.) In addition, Petricoff transferred copies of VR®'s proprietary information and assets, including customers lists and his VR® emails, to other locations, so he could retain them after his term ended and use them to compete. (¶¶ 46, 48, 50-52.) He also communicated with VR® customers regarding VR® business using his personal email address and cell phone number, so that he could maintain contact and transition them to his next business after the end of his franchise (as he did). (¶¶ 73-74.)

Before his agreement expired, Petricoff established a new operating entity to house his competitive business, using a Charlotte address and a name that was confusingly similar to VR®'s marketing materials: NXT Chapter Advisors LLC. (¶ 53.) In addition, he purchased the rights to a URL for his competing business's website and established new business email accounts for himself and his team. (*Id.*) Petricoff entered into agreements with various vendors for his competing independent business. (¶ 54.) In many instances, he transferred the VR® Charlotte Office's existing vendor agreements to his new business entity, which enabled him to continue using the same VR®-recommended vendors and tools and "mirror" the set up and contents of the VR® Charlotte Office's proprietary and customized databases. (¶¶ 54, 87.) Several of these vendors, for example, offered document management databases and platforms, which Petricoff used to facilitate his retention and transfer of VR® confidential materials and assets. (¶¶ 52, 54, 87-90.) As noted, he entered into agreements with other vendors during his term to update and rebrand the VR® Charlotte Office's marketing and promotional materials with his new business name and logo, and to develop his new business website (including by accessing and misusing the data, back-end architecture, and analytics associated with his VR® website to drive traffic to his independent business). (¶¶ 44-45, 51.)

Petricoff also took steps to solicit and poach the VR® Charlotte Office's clients and active business. (¶¶ 55-70.) Although Petricoff was required to transfer and assign all of the VR® Charlotte Office's listings back to Franchisor at the end of his term, Petricoff communicated with various VR® clients about active or potential listings as the end of his term approached in an effort to keep the listings and commissions for himself. (¶¶ 58-63.) He also retained copies of critical deal files necessary for Franchisor to take over and reasonably perform the listings in an effort to

interfere with their assignment. (¶¶ 58-59.) Although Franchisor did not know it at the time, when Petricoff's franchise agreement expired, he had already laid the foundation to immediately launch a competitive spin-off of the VR® Charlotte Office. That is precisely what he did.

**B.      Petricoff Interferes With The Transition of His Franchise**

In the days and weeks before and after his term expired, Petricoff concealed all of his in-term competitive activities from Franchisor, purported to transfer at least some of his VR® assets back to VR®, and repeatedly represented that he was not actively competing and would not do so. (¶¶ 55-56, 64.) Relying on Petricoff's assurances, Franchisor attempted to work with Petricoff to secure control over VR®'s assets, customers and listings so that it could find and establish a permanent successor franchisee in the Charlotte market. (*Id.*) Petricoff, however, repeatedly took steps to frustrate these efforts.

During the term, for example, Petricoff had refused to provide unrestricted access to the VR® Charlotte Office's business records as Article 8.1 of his agreement required, preventing franchisor from assessing compliance with the Franchise Agreement, identifying the vendors it used, or preparing for the transition of its business and assets. (¶ 37.) Although Petricoff was trained by VR® to sell businesses for a living and understands what is reasonably required to transfer a business's assets, he purported to "transfer control" over the VR® Charlotte Office's assets by providing a dump of more than 40,000 records in an unorganized, unsegregated fashion, preventing Franchisor from reasonably identifying critical documents and assets necessary for the transition of the VR® Charlotte's active listings and customers. (¶ 57.)

Ultimately, Franchisor spent weeks and significant resources in an effort to review and identify relevant records. (¶ 57.) But, as Franchisor only later discovered, Petricoff had transferred or deleted numerous VR® records from the materials he provided (some of which were discovered among a cache of purposefully deleted files). (¶ 65.) Reports show that he accessed or moved 14,610 VR® records on the day after his Franchise Agreement expired. (*Id.*) He provided customer lists that included far fewer names than he had told Franchisor they would, and which, as it turns out, were ***stripped of nearly 3000 of the most valuable VR® customer names***, which Petricoff withheld from the list he provided to Franchisor. (¶¶ 66-70.) He also retained his own copies of the VR® Charlotte Office's lists of customers, potential sellers, business leads and marketing contacts for use in his competitive business. (¶ 67-68.)

In addition, although Petricoff was obligated his assign all of the pending VR® listings that he and his associates were working on at the end of his term, he actively sought to interfere and frustrate Franchisor's assumption of those listings. (¶¶ 58-63.) Among other things, he retained copies of critical deal files, including related agreements, buyer information, due diligence materials, and other critical information necessary for Franchisor to take over the listings and preserve the client relationships. (¶ 58.) When Franchisor pressed for this information, Petricoff repeatedly represented that he had turned over "everything" he had. (*Id.*) As it turns out, these representations were inaccurate and misleading, and caused Franchisor to spend weeks on a wild goose chase searching for relevant information. (¶¶ 58, 85-89.)

At the same time, Petricoff continued to take steps to retain the VR® active listings for himself. (¶ 59-63.) As Franchisor later learned, Petricoff never informed his clients of the expiration of his franchise or his obligation to assign their listings to Franchisor before his term ended. (¶ 59.) After it expired, he encouraged VR®'s clients to try to get out of their agreements with VR® and advised that he remained available to work on their listings. (*Id.*) Petricoff also repeatedly tried to condition offers to assist Franchisor in locating relevant deal information on its agreement to proposals that would allow him to retain the listings for himself and use the associated fees to "buy out" his non-compete obligations, effectively seeking to hold VR®'s own information and assets hostage for his personal benefit. (¶ 63.) Petricoff's refusal to reasonably transfer the files necessary to effectuate the assignment of these listings delayed and interfered with Franchisor's assumption of these listing agreements, harmed VR®'s client relationships and reputation in the market, and ultimately caused Franchisor to lose more than $500,000 in commissions. (¶ 61.) Clients associated with these listings told Franchisor that they were unhappy with the manner in which Petricoff had kept them in the dark and put their businesses at risk, damaging VR®'s brand and goodwill. (¶ 59.) Petricoff's conduct during the transition was completely inconsistent with applicable professional and industry standards and intended to harm Franchisor for his own personal benefit. (¶¶ 61-63.)

## C.     Petricoff's Plans Are Revealed

In July and August 2025, still unaware of the extent of Petricoff's misappropriation of its assets and competitive activities, Franchisor continued to work with him to try to locate relevant files, identify VR® missing assets and secure control over them, and protect its rights. (¶ 91.) Over time, however, through its own investigation and the inadvertence of third parties, Franchisor

uncovered clear evidence showing that Petricoff had not been playing it straight. Among other things (as further detailed in the Verified Complaint and its exhibits), Franchisor discovered that after the end of his term:

➤ Petricoff had solicited his former VR® Transaction Manager (Lauren Stewart, MBA, PMP) to join his independent business, who remains on the payroll of his independent business and worked in concert with Petricoff to convert and transition the VR® Charlotte Office to his independent business. (¶ 86.)

➤ Petricoff has continued to solicit VR® clients for his competing business after his term expired, including by misusing the VR® customer lists and data he retained. As his transition plan contemplated, Petricoff has advised his former VR® clients that he is now independent and available to work on transactions, and specific VR® clients have contacted him about potential listings and opportunities with his independent business.(¶ 93.)

➤ Petricoff has continued to actively work on listings and solicit customers he developed during his VR® franchise term. For example, emails show that Petricoff was working with one actual or prospective VR® client on a listing in the days before his franchise agreement expired, and has continued to work on that same VR® listing through at least August 2025. Petricoff never disclosed this business to Franchisor at the end of his term. (¶ 94.)

➤ In late July 2025, Petricoff and his wife (Wendy Petricoff, Business Administrator) contacted the VR® Charlotte Office's insurance provider to transfer its general liability policy to his NXT Chapter Advisors LCC. In response to the carrier's question as to whether "the name change was the only difference or will there be new operations," Petricoff's wife replied: "***This is a name change only. We are leaving a franchise and are now __Independent__***." (Emphasis added.) (¶ 92.)[2]

➤ Petricoff secretly retained various tools and databases he customized for the VR® Charlotte Office (and which contain VR®'s proprietary information and assets) and used them to market and operate his competitive business after his term expired. (¶¶ 83-90.) For example, Franchisor was inadvertently copied on emails that revealed that Petricoff and his Transaction

---

[2] This was the first time Franchisor learned that Petricoff had established a new entity, learned its name, or discovered that Petricoff was "now" operating an "independent" business.

Manager continued to retain the VR® Charlotte's PipeDrive CRM database, which (as the email itself reflects) contained various files associated with the assigned listings that Franchisor had spent weeks looking for. (¶¶ 85-88.) These emails also revealed that Petricoff had set up a second database for his NXT Chapter Advisors LLC business that mirrored the structure and contents of his VR® database. (¶¶ 86-88.) Upon further investigation, Franchisor discovered that Petricoff had retained control over, and never transferred to Franchisor, various platforms, databases and tools he customized and used for VR® business (and their contents). (¶¶ 89-90.)

### D.  Petricoff Gets Caught, But Continues His Unlawful Competitive Activities

When Franchisor discovered Petricoff's retention and use of its assets and other post-term competitive activities, it brought them to Petricoff's attention and demanded (again) that he immediately comply with his obligations and return the VR® assets he had retained. (¶¶ 96-97.) Effectively caught red handed, Petricoff acknowledged that he had retained various assets (which he indicated he would return) but represented that he was not working on any active deals or operating his competitive business. (¶ 96.) Franchisor initially tried to work with Petricoff to try to find a means to ensure his compliance going forward and protect and secure VR®'s assets as it searched for a permanent successor to re-enter the Territory. (¶ 97.)

As it turned out, Petricoff was still stringing Franchisor along. In late September, Franchisor was inadvertently copied on emails that revealed that, despite his representations, Petricoff is continuing to solicit and poach VR® clients and customers, work on active listings, and market and develop his independent business. (¶¶ 89-105.) In one such email, for example, Petricoff communicated with a potential buyer identified on the VR® Charlotte Office's customer lists about its interest in a listing for a Charlotte-based garage door business that Petricoff was actively working on. (¶ 98.) This email reveals that, after Petricoff learned that Franchisor knew about his NXT Chapter Advisors LLC business, Petricoff either established or affiliated himself with a different entity or d/b/a name (HS Exit Advisors), which appears to have been very recently created by Petricoff on or around September 1, 2025. (¶¶ 98-101.) Although purportedly located in Columbia, South Carolina (in a Regus virtual office center), Petricoff and his team continue to live and do business in Charlotte and to contact Charlotte-based customers and business leads identified on VR®'s customer lists in connection with these competitive activities. (¶ 101.) The reasonable inference is that the South Carolina address is a sham to avoid detection of Petricoff's

competitive activities in North Carolina. (*Id.*) During the term, moreover, Petricoff advertised his VR® Office as having a location in Columbia. (¶ 27.) And, regardless of whether Petricoff was actually operating outside of North Carolina, he was conducting competing business using VR®'s confidential and proprietary assets, including VR®'s customers and business leads, in clear breach of his franchise covenants. (¶ 101.)

In late September 2025, Petricoff also accepted meetings with a former VR® client or lead to discuss the valuation and sale of his North Carolina-based business. (¶ 102.) The business at issue appears on the VR® Charlotte Office's customer lists, and the individual Petricoff met with was obviously a potential client he developed during the term because, after the meeting, he left messages for Petricoff at the VR® Charlotte's Office main business line. (*Id.*) To this day, Petricoff also continues to market and operate NXT Chapter Advisors LLC in Charlotte. (¶¶ 103-105.) On September 25, 2025, Petricoff appeared on a podcast in which he was introduced as working for NXT Chapter Advisors LLC, and marketed its competing services in the Charlotte market. (¶ 103.) Through late October 2025, emails inadvertently sent to Franchisor show that Petricoff is continuing to solicit and engage in competitive business with additional former VR® customers and business leads, and is entering into engagement agreements for NXT Chapter Advisors LLC. (¶ 106.) As vendor invoices and communications reflect, he is also continuing to actively develop, market and promote that business through the date of this filing and appears to have plans to imminently launch its competitive website. (¶ 105.)

At present, Franchisor has established an interim affiliated franchisee in Charlotte, leased office space, and entered into contracts with Petricoff's former associates (who ultimately agreed to remain with VR® and is actively seeking a suitable permanent successor to take over the VR® Charlotte Office. (¶¶ 108-110.) At least one such candidate has advised that they are not interested in acquiring the VR® Charlotte Office as long as Petricoff continues to compete in the market and retain and misuse VR®'s proprietary assets. (¶ 111.)

## Argument

To obtain a preliminary injunction, a party must show: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see* Fed. R. Civ. P. 65. Although a

demanding standard, injunctions are "the normal and favored remedy for violations of restrictive covenants" in a franchise agreement governed under Florida law. *Bahia Bowls Franchising LLC v. DJS LLC*, 2023 WL 2303048, at *4 (M.D. Fla. 2023).[3]

## I.   Franchisor is Likely to Succeed on the Merits

Likelihood of success "is generally the most important" factor. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). The movant must demonstrate "only *likely* or probable, rather than *certain,* success." *Id.*

Under Florida law, agreements restricting or prohibiting competition are valid and enforceable so long as they further a "legitimate business interest" and are reasonably limited in time and scope. *Bahia Bowls Franchising LLC*, 2023 WL 2303048, at *4; *see also* Fla. Stat. § 542.355. The restrictive covenants in Article 13 satisfy these requirements.

*First*, the covenants in Article 13 protect Franchisor's legitimate business interests, which under Florida law "include trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers or clients, customer or client goodwill associated with a specific geographic location or specific marketing or trade area, and extraordinary or specialized training." *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1224 (M.D. Fla. 2012) (citing Fla. Stat. § 542.335(1)(b)). As Petricoff has acknowledged, the restrictive covenants in Article 13 further Franchisor's interests in preserving the value of the specialized training, Confidential Information, IP, customer relationships, and substantial goodwill in the Territory that Petricoff acquired solely as a result of his VR® franchise, and which he agreed belonged to Franchisor upon expiration of the franchise term. By preventing Petricoff from using this knowledge and VR®'s own proprietary assets to compete directly against Franchisor, the restrictive covenants protect and preserve, all of these legitimate and protectable interests.[4]

---

[3] Pursuant to Article 17.6, the Franchise Agreement and Plaintiff's claims are governed by Florida law. (Compl., Ex. 1.) Courts in Florida and North Carolina recognize the validity of such contractual choice-of-law provisions and enforce them. *See, e.g.*, *Bahia Bowls Franchising LLC*, 2023 WL 2303048, at *3 (enforcing choice of law provision in Franchise Agreement to apply Florida law to Tennessee-based franchisee); *see also Tanglewood Land Co. v. Byrd,* 299 N.C. 260, 262 (1980); *Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C. App. 626, 631 (1999).

[4] *See, e.g.*, *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1219 (S.D. Fla. 2014) (similar post-termination covenants furthered franchisor's "legitimate business interest in protecting its franchise system, customer goodwill, and existing franchise relationships"); *FLSC Recycling, LLC v. OC Textile Recycling, Inc.*, 2022 WL 21778323, at *4 (S.D. Fla. 2022)

_Second_, the post-termination covenants in the Franchise Agreement are reasonable in time and scope. Where, as here, the covenants at issue further legitimate interests, Petricoff "has the burden of establishing that the contractual restraint is overbroad, overlong or otherwise not reasonably necessary to protect the established legitimate business interests." _Peterbrooke Franchising of Am., LLC_, 2016 WL 8787063, at *8 (citing Fla. Stat. § 542.335(1)(c)). "Florida law requires courts to construe restrictive covenants in favor of providing reasonable protection to _all legitimate business interests_ established by the party seeking enforcement." _Id._ (emphasis added; citing Fla. Stat. § 542.335(1)(h)).

Petricoff cannot show that the covenants are overbroad or otherwise "unreasonable." They prohibit Petricoff from directly or indirectly owning, operating or providing services to a Competitive Business[5] during the term and for a period of 24 months after its expiration in North Carolina or at any location within 40 miles of his former VR® Office or any VR Office in operation. Comparable time and geographic restrictions have repeatedly been upheld as reasonable and enforceable under Florida law.[6] Moreover, the restriction on competing in North Carolina is reasonable here because it tracks the areas in which Petricoff marketed VR® services and conducted VR® business. During the term, Petricoff advertised his VR® franchise as having offices, and serving customers, throughout North Carolina _and into South Carolina_, including

---

("enforcing the restrictive covenant contained in the Franchise Agreement is appropriate and necessary to protect Plaintiff's legitimate business interests" in "protecting: (i) the valuable confidential business information of the Franchise System; (ii) the substantial relationships with prospective and existing customers of its franchisees; and (ii) the goodwill associated with the [] proprietary marks under which franchises operate"); _Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC_, 2016 WL 8787063, at *8 (S.D. Fla. 2016) ("Florida courts have held that covenants not to compete are reasonably necessary to protect a franchisors legitimate business interest of re-entering the market formerly serviced by a terminated franchise.").

[5] "Competitive Business" is reasonably defined to mean "a business that is engaged, wholly or partially, in the business sales/brokerage/intermediary/consulting/business valuation and/or appraisal business or any other business in which we and [Franchisor's] other franchisees are then engaged." (Compl. Ex. 1, p. 41.) Thus, it merely prevents Petricoff from offering the same services he did as a VR® franchisee.

[6] _See, e.g._, _Graphic Business Systems, Inc. v. Rogge_, 418 So. 2d 1084 (Fla. 2d DCA 1982) (finding a two-year time restriction reasonable and upholding a 75-mile radius geographic restriction); _Dyer v. Pioneer Concepts, Inc.,_ 667 So.2d 961, 965 (Fla. 2d DCA 1996) (finding geographic restriction of 100–mile radius operating in more than 5 separate counties reasonable); _Bahia Bowls Franchising LLC_, 2023 WL 2303048, at *4 ("Both a 25-mile restriction and a two-year time limit are reasonable."); _Medi-Weightloss Franchising USA, LLC v. Medi-Weightloss Clinic of Boca Raton, LLC_, 2012 WL 260776, at *1 (M.D. Fla. 2012) (approving covenant that restricted competition within a 25-mile radius of the franchise location and other franchisees).

Columbia, S.C., Rock Hill, S.C., Florence, S.C., Fort Mill, S.C., Hickory, N.C., Huntersville, N.C., Norman, N.C., Matthews, N.C. (¶ 27.) The customers and goodwill he developed in these areas during the term, and is seeking to capitalize on now, belong to VR®. The non-compete obligations thus encompass all of these office locations he advertised. Indeed, when he accepted his franchise, Petricoff specifically agreed that "the length of the term and geographical restrictions are fair and reasonable." (¶ 18.) As such, Petricoff cannot show the restrictions in Article 13.1 are overbroad or unreasonable.[7]

_Finally_, the Verified Complaint and its exhibits establish that Petricoff has repeatedly and deliberately breached, and is continuing to breach, the restrictive covenants in the Franchise Agreement. As the record reflects, Petricoff developed and carried out a secret transition plan that, on its face, shows his efforts and intent to offer the same services, in the same manner, using the same specialized knowledge, tools and forms, and the same customers, and listings, as his former VR® franchise, just under new name(s) and logo(s). (_See, e.g._, ¶¶ 40-47.) Before his agreement expired, and in violation of his in-term covenants, Petricoff actively worked to "rebrand" the VR® Charlotte Office as an independent business, solicited his Charlotte-based VR® business associates and employees to join him, established an independent business entity, name, logo and website for his competing business, and took various steps to retain, alter and repurpose VR®'s confidential and proprietary information and assets for his own ends. (_See, e.g._, ¶¶ 48-54.) After the Franchise Agreement expired, Petricoff and his team (including his Transaction Manager and spouse) have actively worked to market and operate an independent competitive business in the Charlotte market and surrounding areas using those misappropriated assets, including VR®'s customer lists, customized tools and databases, and forms, templates and marketing materials. (_See, e.g._, ¶¶ 58-59, 65-106.) Although the full extent of Petricoff's unlawful activities is presently unknown, there is no question that Petricoff has chosen to deliberately breach the restrictive covenants in his Franchise Agreement in accordance with a carefully-designed plan,

---

[7] And, if the Court concludes that the scope of the non-competition covenant is unreasonable in any respect (and it should not), the proper remedy under both the contract and Florida law is for the Court to modify the covenant. _See_ § 542.335(1)(c) ("If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests); Compl. Ex. 1, 13.1(d). Here, moreover, Petricoff is competing using the clients identified on his former VR® customers lists, and the confidential and proprietary assets and information he misappropriated from VR. That is a breach of Petricoff's franchise obligations regardless of where he is operating.

misrepresented and concealed his competitive activities in an effort to avoid detection, and (as his conduct to date demonstrates) will continue to do so unless and until his conduct is enjoined. Despite Franchisor's extensive efforts to uncover and put an end to his misconduct, Petricoff has not stopped. (*See, e.g.*, ¶¶ 96-106.)

Plaintiff is also likely to succeed on its claim that Defendant violated its obligations upon expiration of the Franchise Agreement. The existing record establishes that, in accordance with his transition plan, Petricoff and his team have misappropriated VR® confidential information and proprietary assets, including its customer lists, proprietary tools and customized databases, forms, templates, marketing materials and business websites, and are using those VR® assets to compete directly against Franchisor. (*See, e.g.*, ¶¶ 64-90.) Petricoff concealed and misrepresented his retention of assets from Franchisor. (*See, e.g.*, ¶¶ 64-65, 68, 86-87, 96.) Courts routinely find that a franchisee's refusal to comply with comparable obligations upon expiration of a franchise are a material breach, and have awarded preliminary injunctive relief requiring them to affirmatively comply. *See, e.g.*, *JTH Tax, LLC v. Gilbert*, 2022 WL 1619594, at *13 (M.D. Fla. 2022) ("Defendants breached the Franchise Agreements by initially failing to return to Liberty its confidential information, client files, and equipment, including computers and printers."); *Magnotte*, 2020 WL 4284056, at *4 (former franchisees breached post-termination obligations under franchise agreements to return confidential information to franchisor); *JTH Tax, Inc. v. Sawhney*, 2019 WL 3051760, at *7 (S.D.N.Y. 2019) (entering TRO requiring former Liberty franchisee to assign leases for franchise locations in accordance with franchise agreements). The Court should do the same here.[8]

## II.     Franchisor Will Suffer Immediate Irreparable Harm.

Franchisor will face "a significant threat of irreparable harm" absent injunctive relief. *Peterbrooke Franchising of Am., LLC*, 2016 WL 8787063, at *9. Harm is irreparable if it "cannot be undone through monetary remedies." *Anago Franchising, Inc. v. C.H.M.I., Inc.,* 2009 WL 5176548, at *11 (S.D.Fla. 2009). Typical irreparable injuries include "'the loss of customers and

---

[8] Although mandatory injunctions carry a higher burden of persuasion, *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014), the record here "clearly" establishes that Petricoff deliberately breached his obligations to return and ceasing using Franchisor's Confidential Information and IP, and did so intentionally and in a manner intended to conceal his activities. Absent relief, his unlawful retention (and continued misuse) of VR®'s assets to compete against Franchisor will cause irreparable harm.

goodwill,'" *Anago Franchising, Inc. v. CHMI, Inc.*, 2009 WL 5176548, at *11, "consumer confusion," and misuse of confidential and proprietary information, *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1005 (S.D. Fla. 1992).

Under Florida law, the violation of an enforceable restrictive covenant creates a *presumption* of irreparable injury. Fla. Stat. § 542.335(1)(j); *Capraro v. Lanier Business Prods., Inc.*, 466 So. 2d 212, 213 (Fla. 1985); *U.S. Lawns, Inc. v. Landscape Concepts of CT, LLC*, 2016 WL 9526340, at *8 (M.D. Fla. 2016) (same); *see TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 Fed. Appx. 403, 406 (11th Cir. 2015) (presumption is "the logical consequence of the movant's … establishment of the covenant's reasonableness in protecting legitimate business interests at stake"). Accordingly, because the restrictive covenants in the Franchise Agreement are enforceable and Petricoff clearly breached them, Franchisor is entitled to a presumption of irreparable injury. *Id.*; *see, e.g., Medi-Weightloss Franchising USA, LLC*, 2010 WL 1837767, at *6 (M.D. Fla. 2010) (breach of restrictive covenant would cause franchisor to "suffer possible dilution and confusion associated with its ... products and services, and will prevent [the franchisor] from enforcing its agreements with other franchisees" and cause "irreparable harm").

Moreover, even without the presumption, the record establishes that, absent injunctive relief, Franchisor has and will continue to suffer irreparable harm from Petricoff's breaches. The facts in the Verified Complaint and its exhibits show that, among other injuries, Petricoff's breaches are:

- Threatening and causing the loss of existing and prospective VR® customers in the Territory, including those specifically identified on VR®'s proprietary customer lists, CRM database, and customer agreements. (*See, e.g.*, ¶¶ 44(d), 46, 49-50, 58-61, 92-94, 98-106.)

- Enabling Petricoff (and his team) to use the specialized training and knowledge their obtained under their VR® franchise to compete unfairly against Franchisor. (*See, e.g.*, ¶¶ 44(f), 46, 47, 49-50, 58-61, 92-94, 98-106.)

- Diluting the value of VR®'s Confidential Information, IP, and proprietary business assets, causing confusion among customers, and permitting Petricoff to unfairly compete against Franchisor using VR® own methods, assets, customers and goodwill. (*See, e.g.*, ¶¶ 44(f), 46, 49-50, 58-61, 65-94, 98-106.)

- Interfering with Franchisor's ability to re-enter the Territory and offer the same proprietary benefits and confidential information and assets, exclusive Territory, and protections against competition to a successor, affecting the marketability and diluting the value of the Territory. *See, e.g.*, ¶¶ 107-111); and

- Harm and usurping the substantial goodwill and brand loyalty that Franchisor has developed in the Territory over decades, and further damage VR®'s reputation within the industry and among VR® clients and consumers (*See, e.g.*, ¶¶ 59-63, 66-74, 88, 93-94, 98-99, 102, 105.)[9]

Petricoff has had every opportunity to cease his unlawful conduct, but has refused to do so and has instead attempted to conceal and misrepresent his activities. Injunctive relief is therefore necessary.[10]

     Petricoff's refusal to comply with his obligations to return and/or cease use of Franchisor's confidential and proprietary information only adds to and compounds the irreparable harm to Franchisor. Without an injunction requiring Petricoff to immediately account for and return the VR® assets he has retained (and/or altered), Franchisor will have no means to protect and preserve its most valuable assets or prevent Petricoff from repurposing them to divert VR®'s customers and business and harm its brand. *See, e.g.*, *JTH Tax, LLC v. Gilbert*, 2022 WL 1619594, at *15 (M.D. Fla. 2022) ("Defendants' failure to adhere to its post-termination obligations under the Franchise Agreements to assign the leases to [franchisor], and subsequent blocking of [franchisor's] access to [its] franchise locations, also continues to cause irreparable harm."); *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, 2011 WL 5359264, at *9 (M.D. Fla. 2011) ("irreparable harm may be suffered if [franchisee] continues to solicit customers from [franchisor's] customer list"); *JTH*

---

[9] As courts have explained, "franchise agreements generally result in a transfer of goodwill, wherein the initial transfer occurs from the franchisor to the franchisee at the outset of the franchise, and the second transfer occurs as a re-transfer of the goodwill from the franchisee back to the franchisor upon termination or expiration of the franchise agreement." *JTH Tax, LLC*, 2022 WL 1619594, at *14.

[10] *See, e.g.*, *Variable Annuity Life Ins. Co. v. Antoniadis*, 2012 WL 3779003, at *1 (M.D. Fla. 2012) (the "risk of Defendant disseminating, disclosing, or using Plaintiff's confidential and proprietary information and trade secrets to the detriment of Plaintiff" demonstrates irreparable harm"); *JTH Tax, LLC*, 2022 WL 1619594, at *14 (finding irreparable harm from the "loss of business opportunities and relationships to provide [the franchise's] services; loss of customers; loss of franchisee stability; loss of ability to sell other franchises; and loss of competitive advantage in each of the franchise territories").

*Tax, Inc. v. Aime*, 2016 WL 4182743, at \*5 (E.D. Va. Aug. 3, 2016) (finding "urgent" risk of irreparable harm where former franchisee launched competing business at the same location).

### III.    The Balance of Equities Supports Issuance of Preliminary Relief

The harm to Franchisor far outweighs any injury that would result to Petricoff from requiring him to abide by his commitments. By statute, Florida law provides that when balancing the equities courts "[s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." Fla. Stat. § 542.335(g)(1). "Any alleged harm to [the breaching franchisee] is solely self-inflicted and cannot outweigh the irreparable harm they would cause to [Franchisor's] franchise business and customer relationships." *JTH Tax, LLC*, 2022 WL 1619594, at \*15; *U.S. Lawns v. Landscape Concepts of CT, LLC*, 2016 WL 9526340, at \*9 (M.D. Fla. 2016) (similar); *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1297 (S.D. Fla. 2020). Thus, "[g]enerally, a franchisee that has breached the terms of its franchise agreement cannot then complain of harm from an injunction preventing further violations of the agreement." *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014). Here, Petricoff made a clear-eyed choice to walk away from his franchise, conceal his plans and activities, and breach his obligations and covenants in order to effectively take VR®'s assets, business and Territory for himself. Any theoretical harm to Petricoff from requiring him to honor his franchise commitments cannot, as a matter of law, overcome the damage his ongoing misconduct is having on Franchisor.

### IV.    Preliminary Relief is in the Public Interest

In Florida, "the public has a cognizable interest in the protection and enforcement of contractual rights," and "[t]his interest is particularly strong with respect to non-compete agreements, as the Florida Legislature has determined that the enforcement of such agreements is in the public's best interest." *Hilb Rogal & Hobbs of Fla., Inc. v. Grimmel*, 48 So. 3d 957, 962 (Fla. Dist. Ct. App. 2010). "[E]nforcement of a covenant not to compete protects proprietary business interests and the enforcement of contracts." *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014). Thus, public policy favors the enforcement of the restrictive covenants and related contractual obligations here. Fla. Stat. § 542.335; *see also* ; *JTH Tax, Inc.*, 2019 WL 2254816, at \*4 ("This injunction furthers [public] policies—it protects Liberty's legitimate franchise-related rights and enforces a reasonable covenant not to compete."); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1157 (S.D. Fla. 1991). No public interest is served

by permitting Petricoff to carry out his unlawful plans to steal VR®'s confidential and proprietary assets, customers and goodwill for his own personal gain.

V.      **No Bond Should Be Required**

Courts have wide discretion to impose a bond, and typically waive it where the "contract waives requirement of a bond and no significant financial constraints are imposed by a TRO." *Bahia Bowls Franchising LLC*, 2023 WL 2303048, at *9. Here, Defendant agreed that if the Franchisor was required to seek injunctive relief with respect to any breach involving Petricoff's obligations upon termination or expiration, or Franchisor's confidential and proprietary information and assets, it could do so "without the posting of any bond or security or, if a bond is nevertheless required …, the parties agree that the sum of $1,000 is a sufficient bond." (Ex. A, 17.3(b.).) "Given Defendants' explicit [contractual] agreement to waive bond and the fact that any costs or damages likely sustained by Defendants result from their failure to abide by the provisions of the Franchise Agreement, [Plaintiff] should not be required to post any bond." *Id.*; *see JTH Tax, LLC*, 2022 WL 1619594, at *17 (similar).[11]

**CONCLUSION**

For the reasons set forth above, the Court should grant a preliminary injunction in accordance with the proposed order submitted herewith requiring Petricoff to abide by his contractual obligations to Franchisor in order to prevent further irreparable harm to Franchisor and its business.

Dated: October 31, 2025                    QUARLES & BRADY LLC


                                           */s/ Zachary Foster*
                                           Zachary Foster
                                           Florida Bar No. 111980
                                           101 East Kennedy Blvd., Suite 3400
                                           Tampa, FL 33602-5195
                                           Tel: 813-387-0273
                                           zachary.foster@quarles.com
                                                   &

---

[11] Alternatively, the Court should impose a bond of $1,000 or less pursuant to the parties' contract. "When a court sets an injunction bond, the amount should reflect the court's determination of the foreseeable damages for a wrongful injunction." *Advantage Digital Sys., Inc. v. Digital Imaging Servs., Inc.*, 870 So. 2d 111, 116 (Fla. Dist. Ct. App. 2003). The bond requirement in Fla. Stat. Ann. § 542.335 is procedural in nature and inapplicable under Fed. R. Civ. P. 65.

Andrew Beilfuss (FLSD Admission Pending)
Florida Bar No.  1049765
Quarles & Brady LLP
411 E Wisconsin Ave, Suite 2400
Milwaukee, WI 53202
Tel: 414-277-5111
andrew.beilfuss@quarles.com

&

Nolan Mitchell (*pro hac vice* filed herewith)
Quarles & Brady LLP
2020 K Street NW, Suite 400
Washington, DC 20006
Tel: 202-780-2644
nolan.mitchell@quarles.com

*Attorneys for Plaintiff King Lombardi Acquisitions, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the forgoing document was served by via Service of Process with Verified Complaint.

*/s/ Zachary Foster*
Zachary Foster